**Mary E. VERBECK, Plaintiff,**

v.

**UNITED STATES, Defendant.**

**No. 08–357C.**

United States Court of Federal Claims.

Aug. 27, 2009.

Steven H. Haney, Haney, Buchanan & Patterson, LLP, Los Angeles, California, for plaintiff.

Steven M. Mager, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him on the briefs were Tony West, Assistant Attorney General, Civil Division, Jeanne E. Davidson, Director, and Bryant G. Snee, Deputy Directory, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C. Of counsel was Lisa M. Flynn, Assistant Regional Counsel, Office of General Counsel, Region X, United States Department of Health and Human Services, Washington, D.C.

## OPINION AND ORDER

LETTOW, Judge.

This case arises from a decision by the Public Health Service ("PHS") to terminate Mary Verbeck, a nurse practitioner, during her probationary period of employment. Prior to her termination, Ms. Verbeck had attained the rank of Lieutenant Commander with the PHS' Commissioned Corps. AR–165 (Personnel Order Number 2121.013 Termination of Mary Verbeck (May, 1 2002)).[1] Ms. Verbeck alleges that the Commissioned Corps' decision to terminate her employment

---

1. AR _____" refers to the administrative record filed with this court in accordance with Rule 52.1(a) of the Rules of the Court of Federal Claims ("RCFC"). The pages of the administrative record are paginated sequentially.

was based on her filing of an Equal Employment Opportunity complaint and notifying the Occupational Safety and Health Administration of potential health and safety violations. Pl.'s Cross–Mot. for Judgment upon the Administrative Record at 1 ("Pl.'s Cross–Mot."). Additionally, Ms. Verbeck asserts that she was entitled to be separated, rather than being discharged, from PHS' Commissioned Corps for disability based upon the fact that she was suffering from complications from breast cancer surgery and severe depression. *Id.* at 13. Lastly, Ms. Verbeck contends that the Board for Correction of PHS Commissioned Corps Records' ("Correction Board's") decision to deny her application to rescind her discharge from the Public Health Service Commissioned Corps was arbitrary and capricious. *Id.* at 2.

The government has filed a two-pronged response to Ms. Verbeck's claims. *See* Def.'s Mot. to Dismiss or, in the Alternative, for Judgment upon the Administrative Record at 1–2 ("Def.'s Mot."). First, the government claims that this court lacks jurisdiction to hear Ms. Verbeck's claim for disability retirement benefits, her Equal Employment Opportunity claim, and her whistleblowing claim. Def.'s Mot. at 6–10. Secondly, the government contends that the Correction Board did not err in upholding Ms. Verbeck's termination "because she was unsuitable for continued service with the Commissioned Corps." Def.'s Mot. at 13.

The court held a hearing on the pending cross-motions on June 3, 2009 and subsequently received clarifying supplemental briefs. The competing motions accordingly are ready for disposition.

### FACTS[2]

The PHS' Commissioned Corps is part of the Department of Health and Human Services but nonetheless is one of the seven uniformed services of the United States military. *See* 10 U.S.C. § 101(a)(4)-(5); *see also* Reorganization Plan No. 3 of 1966, Pub.L. No. 89–810, § 1, 80 Stat. 1610 (1966). The PHS had its genesis in an act for the care of injured and ill merchant seamen adopted by Congress in 1798. *See* U.S. Dep't of Health & Human Servs., U.S. Pub. Health Serv. Commissioned Corps, *About the Commissioned Corps,* http://www.usphs.gov/About Us/history.aspx (Last visited Aug. 24, 2009). The Commissioned Corps was created in 1889 to serve the Marine Hospital Service that traced its roots to the 1798 Act. *See Brooks v. United States,* 65 Fed.Cl. 135, 136 (2005). Today, the PHS' Commissioned Corps "employs approximately 6,000 officers in a variety of medical health professions; those officers administer programs designed to promote public health, prevent disease, and advance public health science." *Middlebrooks v. Leavitt,* 525 F.3d 341, 343 (4th Cir.2008) (citation omitted).

In 1999, Ms. Verbeck was transferred from the Navy to PHS' Commissioned Corps. AR–410 (Chronology). Ms. Verbeck was initially assigned to an Immigration and Naturalization Service ("INS") processing center located in Queens, New York. During her time at this INS facility, Ms. Verbeck received awards for exemplary job performance. *See* AR–182 (Hazardous Duty Award (June 21, 2002)); AR–185 (Recognition Award (May 5, 2000)). Ms. Verbeck worked at the INS' Queens Processing Center until October 1, 2000, when she was transferred to the INS' San Pedro Service Processing Center. AR–410 (Chronology). Ms. Verbeck had requested a transfer from the INS facility in Jamaica, New York because "she had some difficulties adjusting to that site." AR–486 (Aff. of Captain Eugene A. Migliacco, Director of the Division of Immigration Health Services (Jan. 31, 2003)).

Ms. Verbeck worked at the INS' San Pedro Service Processing Center from October 2000 until her termination, which took effect on June 1, 2002. *See* AR–410 to 412 (Chronology). On September 4, 2001, just short of a year after transferring to the San Pedro Center, Ms. Verbeck was diagnosed with breast cancer. AR–696 (Report of Investiga-

---

2. The recitation of facts is drawn from the Administrative Record. *See Santiago v. United States,* 75 Fed.Cl. 649, 653 (2007) ("In accord with RCFC 52. 1, the court 'is required to make factual findings ... from the [administrative] record as if it were conducting a trial on the record.'" (quoting *Acevedo v. United States,* 216 Fed.Appx. 977, 979 (Fed.Cir.2007))).

tion Regarding Equal Opportunity Complaint, HRSA–CC–02–02, Aff. of Mary E. Verbeck (Mar. 8, 2002) ("Verbeck Aff.")). Subsequently, Ms. Verbeck underwent a mastectomy. *Id.* Due to the cancer, surgery, and complications during her recovery, Ms. Verbeck began to suffer from "Major Depression, single episode." AR–249 (Letter from Dr. Kathleen A. Frenchen, Ms. Verbeck's treating physician, to Dr. David G. Hopper, Captain, United States Public Health Service, Senior Medical Evaluations Officer (Feb. 27, 2002)). Ms. Verbeck's doctors sought to treat her with sertraline, "with good response." *Id.* However, Ms. Verbeck's cancer necessitated that she undergo a second surgery on January 4, 2002. AR–696 (Verbeck Aff.).

Upon returning to work after her second surgical procedure, Ms. Verbeck's depression was exacerbated due to two workplace incidents. *See* AR–249 (Letter from Dr. Frenchen to Dr. Hopper (Feb. 27, 2002)); AR–349 (Letter from Verbeck to Commander Yvonne Anthony, one of Ms. Verbeck's supervisors (Feb. 6, 2002)).[3] The first episode occurred on January 18th, 2002, when a detainee Ms. Verbeck was evaluating "reached for [her] neck with his right hand, which brushed up against [her] sweater." AR–349 (Letter from Verbeck to Anthony); *see* AR–650 (Mem. from Security Officer Edmon, who was on duty the night of January 18th, to Security Supervisor (Jan. 18, 2002)). Ms. Verbeck believed that the detainee was attempting to strangle her. *See* AR–349 (Letter from Verbeck to Anthony). Subsequently, on February 6, 2002, Ms. Verbeck received a letter from a detainee who she believed was harassing her. *Id.* Ms. Verbeck believed that the content of the letter was threatening. *See id.*

In light of these two incidents, Ms. Verbeck wrote Commander Yvonne Anthony requesting that the first incident be documented in the facility's OSHA log. AR–349 (Letter from Verbeck to Anthony). Commander Anthony informed Ms. Verbeck that the incident could not be included in the OSHA log because Ms. Verbeck had failed to follow the procedure specified by the Division of Immigration Health Services in reporting the incident to the safety officer or Commander Anthony. AR–350 (Letter from Anthony to Verbeck (Feb. 11, 2002)). Upon being informed that the incident would not be included in the facility's OSHA log, Ms. Verbeck "request[ed] a copy of the OSHA report and a copy of the OSHA log 200." AR–351 (Letter I from Verbeck to Anthony (Feb. 11, 2002)).

Additionally, on February 6, 2002, Ms. Verbeck submitted to Commander Anthony a list of potential OSHA violations that she believed were occurring at the San Pedro facility. *See* AR–352 (Letter from Verbeck to Anthony (Feb. 6, 2002)). Ms. Verbeck claimed that the facility's "current policy of screening detainees in the processing area [is] in direct violation of current OSHA … standards [because of] [p]otential exposure to blood and bodily fluids[,] … [n]o disposable needle container, … [n]o access to emergency kits, or medications[,] … and [n]o access to water." *Id.* In addition to these allegations, Ms. Verbeck enumerated a list of statutory standards which she believed the facility was not achieving. *Id.* at AR–352 to 353. In response, Commander Anthony initiated an investigation that concluded the San Pedro facility's practices were in compliance with OSHA's standards. AR–360 to 366 (Letter from Commander Alysse Gordon, Assistant Health Services Administrator, to Anthony (Feb. 11, 2002)). Commander Gordon's report concluded that Ms. Verbeck was not "following established procedure, nor [was] she well versed in her role as the infection control officer of [the] facility." *Id.* at AR–367.

On February 7, 2002, Ms. Verbeck failed to report to work. *See* AR–391 (Physician's Correspondence (Feb. 7, 2002)). Ms. Verbeck provided Commander Anthony with a note from her physician asking that she be

---

**3.** Ms. Verbeck had two immediate supervisors, Commander Anthony and Commander Kenneth Sowinski. Commander Anthony was the Health Service Administrator at the San Pedro Service Processing Center, *see* AR–489 (HSRA CC–05–02, Aff. of Commander Anthony (Jan. 27, 2003)), and Commander Sowinski was Ms. Verbeck's Clinical Director. *See* AR–499 (HSRACC–05–02, Aff. of Commander Sowinski (not signed) (undated)).

excused from work until February 11, 2002. *See id.* After evaluating Ms. Verbeck over the telephone, her physician concluded that she was suffering from "[m]ajor [d]epression with acute exacerbation [secondary] to workplace harassment." *Id.* Subsequently, on February 12, Ms. Verbeck did not appear at work but provided another note from her physician who, after speaking with her over the phone, requested that her absence be excused due to "[m]ajor depression exacerbated by workplace stress/harassment." AR–392 (Physician's Correspondence (Feb. 12, 2002)). At this point, Captain Ada Rivera, then the Medical Director of the Division of Immigration Health Services, expressed concern that "with this diagnosis and no formal evaluation or treatment, one of our mid-level practitioners [*i.e.*, Ms. Verbeck,] is evaluating and treating patients." AR–394 (Mem. from Captain Rivera to Lieutenant Commander Ken Sowinski, Clinical Director, San Pedro Processing Center (Feb. 13, 2002)). Captain Rivera stated that Ms. Verbeck "should be required to have a complete mental health evaluation that will address her symptoms, diagnosis, and treatment plan. She should not be allowed to see patients or should be monitored closely." *Id.*

On February 14, 2002, Commander Anthony informed Ms. Verbeck that to return to work she needed "to furnish ... medical documentation that would release [her] to return to full duty after [her] absence February 7–8, 2002." AR–699 (Exhibit 6, Equal Opportunity Complaint HRSA–CC–02–02, Aff. of Anthony (Apr. 8, 2002)). Commander Anthony was concerned that the doctor's notes Ms. Verbeck had submitted were inadequate because those evaluations had occurred over the telephone. AR–701 (Aff. of Anthony). Commander Anthony decided to place Ms. Verbeck on paid leave, effective until Ms. Verbeck secured a medical release permitting her to return to work. *Id.* at AR–699. On February 15, Ms. Verbeck provided a physician's evaluation that stated she was suffering from major depression, but that she could "return to work full duty" immediately. AR–393 (Physician's Correspondence (Feb. 15, 2002)).

On February 15, 2002, Commander Anthony sent a letter to Commander William Atwood, Medical Affairs Branch, United States Public Health Service, stating that on the previous day she "was instructed by [her] headquarters to take actions with reference to [Ms.] Verbeck on the local level, and authorized, if necessary, to consult with the Division of Commissioned Personnel directly." AR–371 (Letter from Anthony to Commander Atwood (Feb. 15, 2002)). Commander Anthony stated that it was her belief that Ms. Verbeck "poses a serious risk to the safety of herself, fellow employees, and patients" and "that resolution of these issues on the local level are not possible at present." *Id.* Four days later, via a memorandum dated February 19, 2002, Commander Anthony and Commander Sowinski, Clinical Director of the San Pedro facility, set forth the reasons they believed Ms. Verbeck's "continued presence in the facility [was] detrimental to the functioning, productivity, and staff morale." AR–369 (Mem. from Anthony and Sowinski to Commander Phil Jarres, Acting Chief Field Operations (Feb. 19, 2002)).[4] The memorandum did not question Ms. Verbeck's clinical ability, but cited her behavior, unwillingness to comply with established protocols, interaction with other personnel, and attitude as factors that made her a difficult person to work with at the San Pedro facility. *See* AR–369 to 370 (Mem. from Anthony and Sowinski to Commander Jarres).

---

4. Ms. Verbeck challenges the authenticity of Commander Sowinski's signature on the memorandum. Pl.'s Am. Opp'n to Def.'s Mot. to Dismiss, or in the Alternative, for Judgment upon the Administrative Record at 27 ("Pl.'s Am. Opp'n"). Ms. Verbeck adduced evidence from a forensic expert in the administrative proceedings before the Corrections Board that "[i]t is highly probable that" Commander Sowinski's signature on the memorandum had not been written by him. AR–202 (Opinion of Certified Document Examiner). Ms. Verbeck contends that Commander Sowinski had not concurred in the memorandum. Pl.'s Supp. Br. at 2. Additionally, Ms. Verbeck relies on a clinical evaluation of her work by Dr. Sowinski dated May 9, 2002, that stated "[s]he has proven to be a superior nurse practitioner with excellent clinical skills. She has good clinical acumen, can practice independently, and shows good judgment in seeking consultation." AR–264 (Mem. from Sowinski to Verbeck (May 9, 2002)). *See also* Pl.'s Am. Opp'n at 27 n. 7.

A few days earlier, on February 12, 2002, Commander Sowinski had written an e-mail to his superior, Captain Rivera, stating that Ms. Verbeck was "a very good nurse practitioner with good clinical skills"; however, he noted that "she can become intrusive and have difficulty with her peers. She also has trouble with supervision and her ability to accept direction. She sometimes becomes very critical of other provider's management." AR–346 (E-mail from Sowinski to Rivera (Feb. 12, 2002)). About a year later, Commander Anthony in an affidavit stated her recollection that while Ms. Verbeck's "job performance was good," she tended to be "very disruptive" because she "disagreed with management decisions, questioned ... the orders of ... supervisors," resisted supervision, failed to treat her coworkers with respect, and was argumentative. AR–490 (Aff. of Anthony (Jan. 27, 2003)).[5]

On February 18, 2002, Ms. Verbeck sent OSHA the list of violations that she had identified in her letter of February 6 to Commander Anthony. AR–695 (Verbeck Aff.); AR–629 (Mem. from Verbeck to Patricia J. Mackey, Director HRSA Office of Equal Opportunity & Civil Rights (Feb. 20, 2002)); see also AR–806 (Letter from Leonard Limtiaco, Director of Enforcement & Investigations, OSHA, to Rick Waite, Safety Officer INS San Pedro (Mar. 4, 2002)) (stating that OSHA "received notice of safety/health hazards" on March 4, 2002). On February 19, 2002, Ms. Verbeck was allowed to return to work but was not allowed to see patients. AR–695 (Verbeck Aff.); AR–629 (Mem. from Verbeck to Mackey). The following day Ms. Verbeck was informed that she was being "directed into a nonduty with pay status for a period not to exceed 60 days, unless extended, pending receipt of a second opinion evaluation by the Medical Affairs Branch." AR–396 (Letter from Anthony to Verbeck (Feb. 20, 2002)). Ms. Verbeck was also informed that she had to call her superi-

ors at "9:00 [a.m.] every workday" and was not allowed "to travel beyond a 50–mile radius of [her] home without receiving [Commander Anthony's] or [Commander] Philip Jarres's approval." Id. at AR–396 to 397. Ms. Verbeck initially refused to sign the original order changing her work status to "nonduty with pay." AR–397 (Letter from Anthony to Verbeck).

In light of these developments, Ms. Verbeck filed a discrimination complaint with the Office of Equal Opportunity and Civil Rights. See AR–631 (Letter from Verbeck to Mackey, Formal Discrimination Complaint (Feb. 16, 2002)); AR–685 (Letter I from Mackey to Verbeck (Feb. 25, 2002)). Ms. Verbeck's complaint was "based on 'perceived' physical or mental disability and based on retaliation against [her]." AR–687 (Letter II from Mackey to Verbeck (Feb. 25, 2002)). Ms. Verbeck alleged that she was discriminated against on the basis of a " 'perceived' physical or mental disability" when Commander Anthony required her to furnish "medical documentation that would release [her] to return to full duty" after her absences from work between February 7 and February 12. Id. Secondly, Ms. Verbeck alleged that Commander Anthony's decision to place on her "Nonduty with Pay Status" was retaliation for filing an Equal Employment Opportunity Complaint and notifying OSHA of potential safety and health violations. Id. Lastly, Ms. Verbeck claimed "that management had acted in a malicious manner when they inappropria[t]ely released information which was incorrect about [her] work history and perceived mental disability." Id.

After investigating Ms. Verbeck's allegations, the Office of Equal Opportunity and Civil Rights determined that she had failed to present sufficient evidence to support her allegations of discrimination. AR–839 (Office of Equal Opportunity and Civil Rights, Health Services and Resources Administra-

5. After these events had occurred at the San Pedro facility, Ms. Verbeck's supervisor at the INS facility in Queens was asked to provide information about Ms. Verbeck's performance at INS' Queens Service Processing Center. See AR–344 (Captain Neal Collins, Ms. Verbeck's Supervisor at the Queens Service Processing Center, to Captain Jan Dumont (Apr. 4, 2002)). Cap-

tain Collins stated that Ms. Verbeck "provided acceptable care for her level of experience," but "[p]roblems began to develop shortly after her arrival." Id. Among other things, "LCDR Verbeck had very poor relationships with her peers. She was often [non-]communicative and sullen in her behavior. She would argue with other providers over issues of little consequence." Id.

tion, Department of Health and Human Services, Recommended Decision Regarding EEO Complaint HRSA–CC–02–02 (June 4, 2003)). The Recommended Decision concluded that Ms. Verbeck had neither satisfied her *prima facie* case for disparate treatment based on disability nor established a *prima facie* case that she had been retaliated against for filing an Equal Employment Opportunity complaint. *Id.* at AR–835 to 837. The retaliation claim was rejected on the ground that "[Ms. Verbeck] has failed to demonstrate that management was aware of the fact that she had participated in a protected EEO activity." *Id.* at AR–837. The Recommended Decision gave credence to Commander Anthony's statement "that she was not aware [Ms. Verbeck] had filed an EEO complaint because [Ms. Verbeck] did not seek EEO counseling locally, but filed a formal complaint of discrimination directly with the H[ealth] S[ervices] R[esources] A[dministation] Office of Equal Opportunity and Civil Rights in Rockville, Maryland." *Id.* Finally, notwithstanding that the previously described findings had been made, the Recommended Decision concluded that the Office of Equal Opportunity and Civil Rights did not have jurisdiction over Ms. Verbeck's allegation that she had been retaliated against for filing an OSHA complaint because her notice to OSHA of potential health and safety violations was not a protected activity. *Id.* at AR–838. Thereafter, the United States Surgeon General, acting as the Final Deciding Official, affirmed the Recommended Decision on the ground that Ms. Verbeck's termination made her case moot, "eradicat[ing] the effects of the alleged violation," and her separation prevented her from receiving the relief she had requested. AR–840 (Department of Health and Human Services, Final Decision, Complaint HRSA–CC–02–02 (Dec. 23, 2003)).

While Ms. Verbeck's EEO complaint was pending, on February 27, 2002 Ms. Verbeck's physician, Dr. Kathleen Frenchen, informed the PHS that she had been treating her "since November 9, 2001 for Major Depression, single episode." AR–249 (Letter from Dr. Frenchen to Dr. Hooper (Feb. 27, 2002)). Dr. Frenchen stated initially that Ms. Verbeck's depression could be controlled with

medication, but developments at the San Pedro facility had exacerbated her condition. *Id.* Despite the worsening of Ms. Verbeck's condition, Dr. Frenchen stated that she "is considered fit for full duty." *Id.* A subsequent psychiatric evaluation of Ms. Verbeck conducted by Captain William Nash, a Navy doctor, concluded that she "is considered psychiatrically fit for full duty," but recommended that "[g]iven her stresses and the obvious [e]ffects they have on her emotional state and interpersonal functioning . . . consideration should be given to transferring her to a less stressful work environment." AR–190 to 191 (Letter from Nash to Atwood (Mar. 7, 2002)).

On March 21, 2002, Commander Anthony informed Ms. Verbeck that she would "continue in a nonduty with pay status pending an administrative investigation." AR–398 (Letter from Anthony to Verbeck (Mar. 21, 2002)). This letter informed Ms. Verbeck that

> you must remain in and be available to report back to duty within four hours['] notice.

> You are . . . directed to telephone me at 9:00 AM every workday. . . .

> [Y]ou must remain available to the [Division of Immigration Health Services], and must request leave for absences . . . when you are not available for work. If you fail to do so, and are unavailable when needed or called upon, you will be charged absence without leave (AWOL) for the period of unavailability.

> You are further directed not to travel beyond a 50–mile radius of your home without receiving my or CDR Philip Jarres' approval. . . .

*Id.* Subsequently, Dr. Eugene Migliaccio, Director of the Division of Immigration Health Services, "request[ed] the immediate separation of [Ms.] Verbeck for reasons of unsuitability and for failure to demonstrate the level of performance, conduct, and dedication to duty expected of an officer in the Uniformed Services." AR–338 (Mem. from Dr. Migliaccio to Rear Admiral Michael Davidson, Director, Division of Commissioned Personnel

(Apr. 4, 2002)).[6] Dr. Migliaccio explained that he was requesting the immediate separation based on "[e]motional issues that surfaced early in her first assignment [and] ... resurfaced within three months of arrival at her second assignment;" that Ms. Verbeck was "not receptive to supervision;" that she had "difficulty working with others;" and that the allegations she had made concerning health and safety issues at the San Pedro facility were "unclear, poorly written, and ... unfounded." AR–338 to 339 (Mem. from Migliaccio to Davidson).

Ms. Verbeck was notified on May 1, 2002 that her commission was being terminated because of unsuitability. *See* AR–405 to 406 (Mem. from Captain Denise Canton, on behalf of Rear Admiral Davidson, to Verbeck (May 1, 2002) ("Termination")). Ms. Verbeck was advised that "your repeated failure to adhere to the conduct expected of an officer in a Uniformed Service indicates your lack of suitability for continued service. Further, [you have] demonstrated a lack of professional attitude and attributes expected of an officer in a Uniformed Service." *Id.* at AR–405. In the notice, Ms. Verbeck was informed that the termination of her commission would take effect on June 1, 2002. *Id.*

Ms. Verbeck responded to the notice of termination by filing a complaint with the Office of Equal Opportunity and Civil Rights, claiming that the decision to terminate her was in retaliation for filing the complaint in February 2002, which had alleged that she was being discriminated against because of her disability. *See* AR–444 to 445 (Letter from David Sheldon, Ms. Verbeck's attorney, to Office of Equal Opportunity and Civil Rights (May 3, 2002)). The Health Resources and Services Administration recommended that Ms. Verbeck's complaint be dismissed because she had failed to sustain her allegations of discrimination. AR–612 (Office of Equal Opportunity and Civil Rights, Health Services and Resources Administration, Recommended Decision Regarding

Complaint in HRSA–CC–05–02 (Sept. 30, 2002)). The Recommended Decision stated that Ms. Verbeck was able to satisfy her *prima facie* burden but was unable to rebut the PHS Commissioned Corps' nondiscriminatory reason for the termination—Ms. Verbeck's disruptiveness—which was found not to be a pretext. AR–611 to 612 (Recommended Decision, Complaint HRSA–CC–05–02). Serving as the Final Deciding Official, the United States Surgeon General sustained the Recommended Decision because "the INS found [Ms. Verbeck] was unsuitable for continued service with that agency, which included[ ] her failure to follow established procedures. In addition, ... management found that her behavior was insubordinate and disruptive and constituted conduct unbecoming an officer." AR–613 (Department of Health and Human Services, Final Decision, Complaint HRSA CC–05–02 (Dec. 23, 2003)).

Subsequently, Ms. Verbeck requested through counsel that Rear Admiral Davidson rescind the termination letter or "delay her termination until she can complete medical care that she very much needs or allow her to be considered for a medical discharge." AR–261 (Letter from Sheldon to Rear Admiral Davidson (May 30, 2002)). Rear Admiral Davidson rejected Ms. Verbeck's request, noting that "the Immigration and Naturalization Service ... sought LCDR Verbeck's termination due to unsuitability and failure to demonstrate the level of performance, conduct, and dedication to duty expected of an officer in the Uniformed Services." AR–266 (Admiral Davidson to Sheldon (June 17, 2002)).

On April 9, 2003, roughly ten months after her dismissal from the Commissioned Corps, Ms. Verbeck filed suit in this court alleging that she was wrongfully terminated, that PHS had denied her disability benefits to which she was entitled, and that PHS had wrongfully prevented her from receiving promotions. Compl., *Verbeck v. United States*, No. 03–725C (Fed.Cl. Apr. 9, 2003); *see also*

---

6. The Division of Immigration Health Services is an entity within the Department of Homeland Security that, "[t]hrough an interagency agreement between the Department of Health and Human Services and the Department of Homeland Security ... [,] provides healthcare

to undocumented migrants in the custody of Immigrations and Customs Enforcement." *See* Department of Homeland Security, Division of Immigration Health Services, hhtp://www. inshealth.org/Jobs/Jobs.shtm (last visited Aug. 24, 2009).

Def.'s Statement of Facts at 10; Pl.'s Cross–Mot. at 3. However, Ms. Verbeck had failed to file an application with the Correction Board prior to filing suit in this court. Def.'s Statement of Facts at 10. Consequently, on January 9, 2004, "the parties filed a joint stipulation of dismissal." Def.'s Statement of Facts at 11; *see* Stipulation of Dismissal Without Prejudice, *Verbeck v. United States,* No. 03–725.

After dismissing her case in this court, Ms. Verbeck submitted an application to the Correction Board for relief from the termination. AR–2 to 4 (Application of Verbeck to Correction Board (May 25, 2005)).[7] Ms. Verbeck claimed that she had been wrongfully terminated and sought to have "[t]he record ... corrected to establish that [she] was never separated." *See* AR–276 (Amended Brief in Support of Ms. Verbeck's Application to Correction Board (May 27, 2005)). Ms. Verbeck also claimed that her termination was retribution for filing complaints with the Office of Equal Employment Opportunity and Civil Rights and OSHA. *Id.* at AR–279. She sought to "be promoted to the rank equivalent to her contemporaries," to "be fully reinstated and compensated for back pay and benefits attributable to her promoted rank," and to have a disability rating granted Ms. Verbeck by the Veterans Administration "be applied to the benefits to be received by her at her promoted rank." *Id.* at 276.[8]

Preparatory to evaluating Ms. Verbeck's application, the Correction Board received an advisory opinion from Captain Denise Canton, Director of the Office of Commissioned Corps Operations, which included a medical evaluation of the records Ms. Verbeck was presenting to the Correction Board to determine if she was fit for duty when she was discharged. *See* AR–329 (Advisory Opinion in the Case of Mary Verbeck from Captain Canton (Feb. 22, 2006)). The medical evaluation was prepared by Captain Vito Caserta, Senior Medical Evaluations Officer for the Medical Affairs Branch of the United States Public Health Service, who determined that Ms. Verbeck "was fit for duty at the time of her termination.... The determination at the time that [Ms. Verbeck] was fit for duty and that the case did not merit a Medical Review Board was reasonable and correct." AR–403 (Mem. from Captain Caserta to Captain Canton (Sept. 22, 2005)). Based upon this determination of Ms. Verbeck's fitness for duty at the time of her termination, Captain Canton found that her claims to the Correction Board should be denied because of "insufficient relevant evidence to demonstrate the existence of a probable material error or injustice with regard to her request for reinstatement, promotion and disability retirement." AR–329 (Advisory Opinion by Captain Canton). Captain Canton stated

that personality and behavioral problems predated the incidents that led to [Ms. Verbeck's] termination and these personality and behavioral problems were primary factors contributing to the finding by the Immigration and Naturalization Service (INS) that she was unsuitable for continued service. Extensive documentation submitted by the INS and attached to this advisory opinion clearly supports a finding

7. The Board for Correction of PHS Commissioned Corps Records constitutes "the highest administrative appe[llate] body within the Department of Health and Human Services for [C]ommissioned [C]orps officers." AR–900 (E-mail from Dan Clutch, Director, Program Support Center, Department of Health and Human Services, to John Anderson, Centers for Disease Control, *et al.* (March 28, 2005)). The Board is comprised of civilian employees within the Department, three of whose members sit on any given case on a rotating basis. *Id.* The Director, Program Support Center, is the approving official on all Board recommendations. *Id.*

The Correction Board is authorized by 42 U.S.C. § 213a(a)(12), which, among other things, extends to the Commissioned Corps the provisions of 10 U.S.C. § 1552 relating to boards for the correction of military records. The Secretary of Health or Human Services serves as the responsible authority. *See* 42 U.S.C. § 213a(b). Thus, the Secretary of Health and Human Services acts through a civilian correction board "to correct an error or remove an injustice." 10 U.S.C. § 1552(a)(1); *see Brooks,* 65 Fed.Cl. at 137.

8. After her termination, Ms. Verbeck had applied to the Department of Veterans Affairs "for service connected compensation." AR–160 (Department of Veterans Affairs to Ms. Verbeck (Sept. 25, 2003)). The Department of Veterans Affairs awarded Ms. Verbeck a disability payment of $714.00 per month. *Id.*

that Ms. Verbeck's commission was properly terminated.
AR–332 (Advisory Opinion by Captain Canton). Captain Canton also raised a jurisdictional issue of whether the Correction Board could grant effective relief because Ms. Verbeck "was detailed to the San Pedro California Service Processing Center, a detention center with medical facilities of the [INS]. The Board lacks jurisdiction over INS personnel activities." *Id.*

The Correction Board convened on February 9, 2009 to evaluate Ms. Verbeck's application, *see* AR–427 (Minutes of the Correction Board (Feb. 9, 2007)), and it subsequently entered a Final Decision that "[a]t the time she [was] separated, she was found fit for full duty and thus was not entitled to a disability retirement." AR–431 (Correction Board Final Decision Regarding Ms. Verbeck, Case No. 05–515 (Mar. 28, 2007) ("Correction Board's Decision")). That finding was by Ms. Verbeck's physician in February 2002, although the results of Captain Nash's psychiatric evaluation of Ms. Verbeck in March 2002 were more equivocal. The Board ruled that Ms. Verbeck's "record supports a conclusion by the Medical Affairs Branch (MAB) that Ms. Verbeck's request should be denied because the evidence shows that she was not unfit for continued duty at the time of her discharge." *Id.* at 432. In this connection, the Board also rejected Ms. Verbeck's claim that her VA disability rating should be applied as evidence of the disability retirement benefits due from PHS' Commissioned Corps. *Id.* The Board accepted Captain Caserta's conclusion "that although a medical condition is ratable according to the VA schedule for rating disabilities, it does not necessarily constitute a disability for which PHS retirement or separation disability benefits will be granted." *Id.* (quoting AR–403, Mem. from Captain Caserta to Captain Canton). The Board also

concluded that because Ms. Verbeck was "properly terminated," there was no need to correct her records. *Id.* Additionally, the Board decided that her request to "be promoted to the rank equivalent to her contemporaries [wa]s moot based on the termination of her commission." *Id.* In support of the conclusion that Ms. Verbeck was "properly terminated," the Board stated that it was relying on the "[e]xtensive documentation submitted by the Immigration Naturalization Services." *Id.*

As an alternative ground for its decision, the Correction Board stated that it lacked "jurisdiction over INS personnel activities." AR–432 (Correction Board's Decision) ("Since Ms. Verbeck was not on the rolls of a PHS agency at the time of her separation, no PHS agency has a duty to reinstate the officer and giver her back pay.)." [9] Notwithstanding this jurisdictional statement by the Board, the record before the Board contained a statement by Rudolph Garcia, the Officer-in-Charge of the INS' San Pedro facility stating that he did not have anything to do with Ms. Verbeck's termination and that "[n]o one working for the INS at San Pedro requested that she be terminated." AR–151 to 152 (Statement of Rudolph Garcia). Mr. Garcia also commented that "I, as a supervisor with the INS, had no authority over Ms. Verbeck. The INS management has authority for hiring, supervising and terminating their own employees, but no authority over the U.S. Public Health Service employees. The USPHS has authority for hiring, supervising and terminating their own employees." *Id.*

Thereafter, Ms. Verbeck filed her second complaint in this court on March 19, 2008. Subsequently, the government submitted the administrative record and the parties presented and briefed the cross-motions that are now at issue.[10] The court held a hearing on the cross-motions on June 3, 2009.

**9.** This latter jurisdictional statement, if true, would negate Ms. Verbeck's discharge because she was terminated by Captain Canton acting for Rear Admiral Davidson of the PHS. *See* AR–405 to 406 (Mem. from Captain Canton on behalf of Rear Admiral Davidson to Ms. Verbeck (May 1, 2002)).

**10.** Additionally, both parties filed motions to supplement the administrative record. Pl.'s Supplemental Administrative Record (Jan. 7, 2009); Def.'s Mot. to Supplement the Administrative Record (May 15, 2009). The government has sought to supplement the administrative record with documents "relating to the appointment of

## JURISDICTION

Jurisdiction must be established as a threshold matter. *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 88–89, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). As plaintiff, Ms. Verbeck bears the burden of proving that the court has jurisdiction to consider her claim. *See McNutt v. General Motors Acceptance Corp. of Ind.,* 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936). In determining whether jurisdiction exists, federal courts must accept as true the facts alleged in the complaint and draw all reasonable inferences in favor of plaintiff. *Henke v. United States,* 60 F.3d 795, 797 (Fed.Cir. 1995). The factual allegations contained in plaintiff's claim for relief must be plausible for the court to accept them, and a court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (explaining that factual allegations "must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)"); *see also Cambridge v. United States,* 558 F.3d 1331, 1335 (Fed.Cir.2009). The Supreme Court has stated that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* —— U.S. ——, ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (citing *Twombly,* 550 U.S. at 556, 127 S.Ct. 1955).

The Tucker Act provides this court with "jurisdiction to render judgment upon any claim against the United States founded . . . upon the Constitution, or any Act of Congress or any regulation of an executive department." 28 U.S.C. § 1491(a)(1). The Tucker Act, standing alone, is insufficient to vest this court with jurisdiction. *See, e.g., United States v. Testan,* 424 U.S. 392, 398, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976); *Martinez v. United States,* 333 F.3d 1295, 1302–03 (Fed. Cir.2003) (en banc). The Tucker Act serves as a waiver of the United States' sovereign immunity for certain claims that " 'can fairly be interpreted as mandating compensation by the [f]ederal [g]overnment for the damage sustained.' " *United States v. Mitchell,* 463 U.S. 206, 217, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983) (quoting *Testan,* 424 U.S. at 400, 96 S.Ct. 948); *see also United States v. White Mountain Apache Tribe,* 537 U.S. 465, 473, 123 S.Ct. 1126, 155 L.Ed.2d 40 (2003) ("[A] fair inference will do."). Thus, to invoke the Tucker Act, the plaintiff must rest his or her claim on a money-mandating source of law.

If plaintiff identifies a substantive source of law that is capable of being inter-

civilian members of the [Board] who decided Ms. Verbeck's case, and their e-mail communications with the Director of the Program Support Center." Def.'s Mot. To Supplement the Administrative Record at 1. Additionally, the government filed as a supplement to the administrative record the Department of Veterans Affairs' decision dated September 22, 2003, making a disability rating for Ms. Verbeck. Def.'s Reply to Pl.'s Resp. to Def.'s Mot., App. 22. Ms. Verbeck has not filed any opposition to defendant's proposed supplementation of the administrative record.

Ms. Verbeck has moved to supplement the administrative record with a set of six documents. Pl.'s Supplemental Administrative Record at 2 (listing Exs. A through F). The government has stated that it opposes allowing Ms. Verbeck to supplement the administrative record with two of these exhibits, Exhibits B and E, on the ground that those documents were not presented to the PHS or the Correction Board. Def.'s Resp. to Pl.'s Supplementation of the Record at 1–2.

Exhibit B of plaintiff's proffered supplementation is a letter from Lieutenant Bruce Lyday, a security officer at the San Pedro facility, to Ms. Verbeck informing her that one of the detainees had become infatuated with her and thus she should avoid "treat[ing] him without adequate security." Pl.'s Supp. Ex. B at 873 (Mem. from Lieutenant Lyday to Ms. Verbeck (Feb. 11, 2002)). Exhibit B is a record generated by a governmental official during Ms. Verbeck's tenure at the INS' San Pedro facility. This record should have been included in the administrative record submitted by the government, and thus it will be included now.

Exhibit E to plaintiff's proffered supplement is an affidavit from Commander Anthony that is part of the administrative record in a separate case, *Kahn v. United States,* Fed. Cl. No. 08–476C (filed June 30, 2008); *see* Pl.'s Supp. Ex. E at 880 (Aff. of Anthony (Mar. 8, 2002)). The affidavit was not before the PHS when it decided to terminate Ms. Verbeck from the Commissioned Corps nor was it before the Correction Board when it considered her application to reconsider her discharge. Thus, the affidavit will not be included in the administrative record.

preted to mandate compensation from the United States for the injury sustained and makes "a nonfrivolous assertion that [she is] within the class of plaintiffs entitled to recover under the money-mandating source, [then] the Court of Federal Claims has jurisdiction." *Jan's Helicopter Serv., Inc. v. Federal Aviation Admin.*, 525 F.3d 1299, 1307 (Fed. Cir.2008). Only after completing this initial jurisdictional inquiry will the court address the specific question of whether the facts in plaintiff's case fit within the terms of the statute. *See Greenlee County, Ariz. v. United States*, 487 F.3d 871, 876 (Fed.Cir.2007) (citing *Fisher v. United States*, 402 F.3d 1167, 1172 (Fed.Cir.2005) (en banc in relevant part)).

### A. *Pay and Allowances*

An officer in PHS' Commissioned Corps is considered to be a member of one of the uniformed services of the United States military. *See* 10 U.S.C. § 101(a)(5)(C). By statute, Congress has sought to extend many of the benefits that members of the armed forces receive to PHS' Commissioned Corps. 42 U.S.C. § 213a. Section 213a provides that "[c]ommissioned officers of the Service ... are entitled to all the rights, benefits, privileges, and immunities now or hereafter provided for commissioned officers of the Army ... under the ... provisions of Title 10" that are identified in the statutory text. 42 U.S.C. § 213a(a). For the purposes of Ms. Verbeck's case, the most pertinent provisions of Title 10 that are made applicable to PHS' Commissioned Corps officers are "Chapter 61, Retirement or Separation for Physical Disability;" "Section 1552, Correction of military records: claims incident thereto;" "Section 1553, Review of discharge or dismissal;" and "Section 1554, Review of retirement or separation without pay for physical disability." 42 U.S.C. § 213a(a)(2), (12)-(14).

In the instant case, Ms. Verbeck cites the Military Pay Act, 37 U.S.C. § 204, as a money-mandating provision that allows this court to adjudicate Ms. Verbeck's claim for back pay and allowances. Compl. ¶ 2. The Military Pay Act provides that "a member of the uniformed service who is on active duty" is "entitled to the basic pay of the pay grade to which assigned." 37 U.S.C. § 204(a)(1). PHS' Commissioned Corps is a uniformed service, *see* 10 U.S.C. § 101(a)(5), and the Federal Circuit has repeatedly held that the Military Pay Act is money mandating. *See, e.g., Martinez*, 333 F.3d at 1303.[11]

The Federal Circuit has explained that "to bring a military discharge case in the Court of Federal Claims, a plaintiff ... must allege that, because of the unlawful discharge, the plaintiff is entitled to money in the form of the pay that the plaintiff would have received but for the unlawful discharge." *Martinez*, 333 F.3d at 1303; *see also Christian v. United States*, 337 F.3d 1338, 1341–42 (Fed.Cir.2003) (explaining that "members of the military who have been improperly discharged are treated as having continued to serve until they are properly discharged; they are therefore entitled to back pay and allowances for that period of constructive service"). Ms. Verbeck alleges that her termination was wrongful and seeks to recover "back pay and allowances from the time of [her] discharge." Compl., Prayer for Relief ¶ 3. The allegations contained in Ms. Verbeck's pleadings are sufficient to establish that this court has jurisdiction over her claim for back pay and allowances.

### B. *Disability Separation*

The government initially contested whether this court had jurisdiction over Ms. Ver-

---

**11.** In addition, as previously noted, for PHS' Commissioned Corps, 42 U.S.C. § 213a makes applicable "Section 1552, Correction of military records: claims incident thereto." 42 U.S.C. § 213(a)(12). Section 1552 itself contains an authorization for back pay: "The Secretary concerned may pay, from applicable current appropriations, a claim for the loss of pay, allowances, compensation, emoluments, or other pecuniary benefits, or for the repayment of a fine or forfeiture, if, as a result of correcting a record under this section, the amount is found to be due the claimant...." 10 U.S.C. § 1552(c).

However, Section 1552 is not a money-mandating statute for purposes of the Tucker Act. *See Martinez*, 333 F.3d at 1315 & n. 4. Rather, relief under Section 1552 turns on a source of back pay in another statute. *Id.* at 1315 n. 4 (explaining and reconciling the prior decisions in *Dehne v. United States*, 970 F.2d 890 (Fed.Cir.1992), and *Blum v. United States*, 227 Ct.Cl. 555 (1981)).

beck's claim that she was entitled to separation based upon her medical conditions. *See* Def.'s Mot. at 6 ("Ms. Verbeck fails to establish—and is unable to establish—that her disability retirement benefits claim is based upon a money-mandating statute.") Subsequently, however, the government changed tack and stated "that this [c]ourt possesses jurisdiction to entertain Ms. Verbeck's disability claim." Def.'s Reply at 11–12. Ms. Verbeck asserts that her claim is appropriate under 10 U.S.C. § 1203 because she "was entitled to separation based on disability." Pl.'s Cross–Mot. at 13. Section 1203 provides that if the Secretary concludes that a service member is "unfit to perform the duties of the member's office, grade, rank, or rating because of physical disability incurred while entitled to basic pay . . . the member may be separated from the member's armed force, with severance pay." 10 U.S.C. § 1203(a); *see also* 42 U.S.C. § 213a(a)(2) (applying 10 U.S.C. § 1203 to PHS' Commissioned Corps).

 It is well-established that this court has jurisdiction over military disability claims. *See Chambers v. United States,* 417 F.3d 1218, 1223 (Fed.Cir.2005) (citing *Fisher,* 402 F.3d at 1174–75); *Haskins v. United States,* 51 Fed.Cl. 818, 823 (2002). Typically, military disability claims arise under 10 U.S.C. § 1201, which addresses the disability retirement of service members. *See, e.g., Fisher,* 402 F.3d at 1174–75; *DeBatto v. United States,* 87 Fed.Cl. 172, 177 (2009). Section 1203 is a counterpart to Section 1201, except that it applies to disability upon separation rather than upon retirement. Under both statutes, a monetary remedy is provided. The monetary remedy for disability under Section 1203 is severance pay while that under Section 1201 is retirement pay.[12] Accordingly, Section 1203 is a money-mandating statute for the same reasons that Section 1201 is a money-mandating source of law for purposes of the jurisdiction of this court.

### C. *Whistleblower Protection*

In addition to her claims for separation and disability, Ms. Verbeck presents claims that are based upon perceived retaliation for reporting violations to OSHA. Pl.'s Cross–Mot. at 7. Ms. Verbeck contends that she was discriminated against and terminated due to notifying OSHA of potential health and safety violations at the San Pedro facility and that her activities in this regard qualify as whistleblowing. *See* Hr'g Tr. 29:24 to 30:4 (Mar. 10, 2008). The government asserts that protections afforded whistleblowers do not apply to PHS' Commissioned Corps. Def.'s Mot. at 9–10. The government notes that 10 U.S.C. § 1034, the Military Whistleblower Protection Act, is the only statutory provision governing whistleblowing that a member of the uniformed services could invoke, but the government asserts that the Military Whistleblower Protection Act does not apply to the Commissioned Corps. *Id.* at 10.

 The government is correct that Ms. Verbeck is not covered by any statutory protection for whistleblowers. As an officer in the PHS' Commissioned Corps, Ms. Verbeck was a member of a uniformed service and is thus not eligible for the protections of the whistleblower act pertinent to civilian employees of the federal government. *See* Whistleblower Protection Act of 1989, Pub.L. No. 101–12, 103 Stat. 16 (codified in scattered sections of 5 U.S.C.). Furthermore, Ms. Verbeck is not able to avail herself of the Military Whistleblower Protection Act because Congress, in enacting and subsequently amending 42 U.S.C. § 213a, has specified which provisions of Title 10 of the United States Code shall apply to the Commissioned Corps but has not included the Military Whistleblower Protection Act as one of the incorporated provisions. *See* 42 U.S.C. § 213a (not including Section 1034 among rights, privileges, and emoluments afforded to the Commissioned Corps). The resulting

---

**12.** In most cases in this court where both Sections 1201 and 1203 are involved, a service member will have been awarded a disability rating that has entitled that member to a severance payment under Section 1203, but the member contests the rating, seeking a higher disability rating that would entitle the member to disability retirement pay under Section 1201. *See, e.g., DeBatto,* 87 Fed.Cl. at 173–76. Ms. Verbeck, however, received no disability rating from PHS' Commissioned Corps and consequently has invoked Section 1203.

gap in coverage means that, as a member of the PHS' Commissioned Corps, Ms. Verbeck was not entitled to receive the protection of whistleblower protection provisions found in the United States Code.

### D. Disability Discrimination

▉▉▉▉ Ms. Verbeck's factual allegations also present the claim that she was terminated for filing complaints with the Office of Equal Opportunity and Civil Rights alleging that she was discriminated against in contravention of the Americans with Disabilities Act. Def.'s Mot. at 8; see AR–631 (Formal Discrimination Complaint (Feb. 16.2002)).[13] In pertinent part, the Americans with Disabilities Act provides that "[n]o person shall discriminate against any individual because such individual ... made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [the Americans with Disabilities Act]." 42 U.S.C. § 12203(a). In interpreting the scope of this statute, courts have consistently found that "uniformed members of the armed services are ... barred from bringing claims under the A[mericans with] D[isabilities] A[ct]." Baldwin v. United States Army, 223 F.3d 100, 101 (2d Cir.2000); see also Coffman v. State of Mich., 120 F.3d 57, 59 (6th Cir. 1997). In 1998, Congress enacted the Health Professions Education Partnership Act, Pub.L. No. 105–392, § 402(a), 112 Stat. 3524 (1998), which added a provision to 42 U.S.C. § 213 that provides, in relevant part, that "[a]ctive service of commissioned officers of the [PHS' Commissioned Corps] shall be deemed to be active military service in the Armed Forces of the United States for purposes of all laws related to discrimination on the basis of race, color, sex, ethnicity, age, religion, and disability." 42 U.S.C. § 213(f). Although this statutory amendment might seem to have had the effect of extending protection to the Commissioned Corps, in actuality it had the opposite effect because of the prior interpretation of the Americans

with Disabilities Act. See Hedin v. Thompson, 355 F.3d 746, 748–51 (4th Cir.2004) (construing Section 213(f) and holding that officers of PHS' Commissioned Corps, even if not engaged in military service, are treated as military officers for purposes of the military exception); see also Middlebrooks v. Leavitt, 525 F.3d 341, 345–47 (4th Cir.2008) (reaching the same result on different statutory grounds with respect to an applicant for a position in PHS' Commissioned Corps). Thus, the Americans with Disabilities Act did not apply to Ms. Verbeck during her tenure with PHS' Commissioned Corps.

### STANDARDS FOR DECISION

▉▉▉▉ In reviewing the decision of the Correction Board, this court has a limited role. See, e.g., Heisig v. United States, 719 F.2d 1153, 1156 (Fed.Cir.1983); Brooks, 65 Fed.Cl. at 140. To overturn the Board's decision adverse to her claims, Ms. Verbeck needs to demonstrate that the Board's decision was arbitrary and capricious, contrary to law, or unsupported by substantial evidence. See, e.g., 5 U.S.C. § 706(2)(A); Chambers v. United States, 417 F.3d 1218, 1227 (Fed.Cir. 2005). In its judicial role, the court does not act as "a super correction board." Skinner v. United States, 219 Ct.Cl. 322, 594 F.2d 824, 830 (1979). It is well-established "that courts cannot substitute their judgment for that of the military departments when reasonable minds could reach differing conclusions on the same evidence." Heisig, 719 F.2d at 1156.

▉▉▉▉ Nonetheless, the deferential standard of review owed to the Board's decisions does not excuse the Board from considering all of the relevant evidence and proffering an explanation that establishes a "rational connection between the facts found and the choice made." Bowen v. American Hosp. Ass'n, 476 U.S. 610, 626, 106 S.Ct. 2101, 90 L.Ed.2d 584 (1986); see also Marsh v. Oregon Natural Res. Council, 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377

13. The government contends that Ms. Verbeck has brought claims under Title VII of the Civil Rights Act of 1964, codified as amended at 42 U.S.C § 2000e et seq. Def.'s Mot. at 8. Title VII of the Civil Rights Act of 1964 provides that "[a]ll personnel actions affecting employees ... in military departments ... shall be made free from any discrimination based on race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–16(a). However, Ms. Verbeck has not alleged that she was discriminated against on any of these grounds.

(1989) (stating that a court "must consider whether the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment"). The Supreme Court has explained that the substantial evidence standard, as applied in the context of judicial review of an administrative decision, requires "more than a mere scintilla [of evidence]. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938); *see also Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1379 (Fed.Cir.2009) (quoting *Consolidated Edison); Heisig*, 719 F.2d at 1157 (stating that the substantial evidence standard of review "does not require a reweighing of the evidence, but a determination whether *the conclusion being reviewed* is supported by substantial evidence").

## ANALYSIS

Ms. Verbeck's complaint sets forth two claims over which this court has jurisdiction. First, Ms. Verbeck alleges that she was wrongfully discharged from her position with PHS' Commissioned Corps and is entitled to receive back pay and allowances. Compl. ¶ 58; Pl.'s Mot. at 1. Second, she alleges that PHS failed to present her case to a medical review board, thereby depriving her of the opportunity to receive a disability separation. Compl. ¶ 63, Pl.'s Mot. at 1–2. Respecting each of these claims, Ms. Verbeck alleges that the Board's decision was "arbitrary and capricious, unsupported by substantial evidence, and contrary to law." Compl. ¶ 65, Pl.'s Mot. at 2.

### A. *Termination*

Ms. Verbeck seeks to recover back pay and allowances on the ground that she was wrongfully terminated from her position with the Commissioned Corps. *See* Pl.'s Cross–Mot. at 6–7. Ms. Verbeck claims that the "true motive for her termination was reprisal for filing both with the EEO and making other justified complaints." *Id.* at 7. She draws support for her contention from the fact that "[t]he disparaging documentation regarding [her] behavioral issues" was not generated until she filed complaints with the Office of Equal Opportunity and Civil Rights and OSHA. Pl.'s Cross–Mot. at 27.

Ms. Verbeck held a reserve commission in the Commissioned Corps. AR–405 (Termination). The United States Code provides that "[r]eserve commissions shall be for an indefinite period and may be terminated at any time, as the President may direct." 42 U.S.C. § 209(a)(2); *see* 42 U.S.C. § 216(a) (giving the President the authority to "prescribe regulations with respect to the . . . termination of commission[s], . . . of the commissioned corps of the Service"). The President has delegated "[t]he authority under Section 207(a)(2) to terminate commissions of officers of the Reserve Corps without the consent of the officers concerned" to the Secretary of Health and Human Services. Exec. Order No. 11,140, 29 Fed.Reg. 1,637 (Jan. 30, 1964) (as amended by Exec. Order No. 12,608, 52 Fed.Reg. 34,617 (Sept. 9, 1987)). Pursuant to the same Executive Order, the President delegated authority to the Secretary of Health and Human Services to prescribe regulations under 42 U.S.C. § 216(a). *Id.*

Relying on this delegation of authority, the Secretary of Health and Human Services promulgated a regulation that addressed the issue of terminating an officer during the individual's probationary period. Def.'s Mot., App. at 18 (eCCIS CC43.7(D)(1)).[14] The regulation provides that "[a] reserve corps officer will serve a probationary period consist-

---

**14.** This regulation was not published in the *Federal Register*. Among other things, the Administrative Procedure Act exempts "a matter relating to agency management or personnel" from requirements for advanced notice and opportunity to comment. 5 U.S.C. § 553(a)(2).

The regulation is a part of the Electronic Commissioned Corps Issuance System (thus "eCCIS"), formerly known as the Commissioned Corps Personnel Manual. Def.'s Mot. at 6. The Electronic Commissioned Corps Issuance System is publicly available through the internet at http://dcp.psc.gov/eccis. A partial copy of the pertinent provisions is also part of the record of this case as an Appendix to Def.'s Mot., and a more complete copy is set out as an Appendix to Pl.'s Am. Opp'n to Def.'s Mot. eCCIS CC43.7 was promulgated by the Secretary of Health and Human Services. *See* Def.'s Mot., App. at 26 (eCCIS CC43.7 (Apr. 22, 2002)).

ing of the first 3 years of any tour of active duty. The commission of any reserve corps officer on active duty may be terminated without cause at any time during the 3–year probationary period." *Id.* Additionally, eCCIS CC23.7 is relevant to the status of reserve corps officers during their probationary period. Def.'s Mot., App. at 1–3 (eCCIS CC23.7).[15] The regulation provides that

> [a]ll individuals called to active duty in the PHS reserve corps are required to serve a 3–year probationary period.... At any time during the probationary period, an officer may be separated from active duty for reasons including, but not limited to, the following:
>
> a. Abolishment of an officer's position as a result of personnel or budgetary limitations; ...
>
> b. Unsuitability ...;
>
> c. Failure to demonstrate the level of performance, conduct, dedication to duty, or professional attitude and attributes expected of an officer in the Uniformed Services;
>
> d. Refusal to accept reassignment; or
>
> e. Unsatisfactory conduct before call to active duty which is discovered subsequent to entry on duty.

Def.'s Mot., App. at 2–3 (eCCIS CC23.7(D)).

The Secretary of Health and Human Services has delegated to the Assistant Secretary for Health and the Surgeon General the authority to "[t]erminate commission of Reserve Corps officers without the consent of the officers concerned pursuant to 42 U.S.C. § 209(a)(2)." Delegation Authority, 53 Fed. Reg. 3,457 (Feb. 5, 1988) (delegating the authority to the Assistant Secretary for Health); Delegation Authority, 53 Fed.Reg. 5,046 (Feb. 19, 1988) (delegating the authority to the Surgeon General). The delegation to the Surgeon General to terminate commissions of reserve corps officers allowed the individual holding that position to redelegate

that authority "to only those officials of the Public Health Service who are required to be appointed by the President." 53 Fed.Reg. at 5,046. Pursuant to this authority, the Surgeon General has redelegated the authority to terminate commissions of reserve corps officers to the Director of the Division of Commissioned Personnel. *See* Def.'s Mot., App. at 4–6 (eCCIS CC23.7(E)).

■ Ms. Verbeck was terminated during her three year probationary period for cause, on the grounds that she did not possess the "attitude and attributes expected of an officer in the Uniformed Services" and had demonstrated a "lack of suitability for continued service." *See* AR–405 (Termination). The Correction Board's action in upholding Ms. Verbeck's termination followed Captain Canton's expressed reasons for the termination, which reasons had been reiterated in an Advisory Opinion by Captain Canton provided to the Board. AR–432 (Correction Board's Decision); *see also* AR–329 to 332 (Advisory Opinion by Captain Canton). In addition, both Captain Canton's Advisory Opinion and the Correction Board's Decision asserted that Ms. Verbeck had been detailed to the INS, that the termination was attributable to actions by the INS, and that the Correction Board "lack[ed] jurisdiction over INS personnel activities." AR–432 (Correction Board's Decision); AR–332 (Advisory Opinion by Captain Canton).

Ms. Verbeck asserts that the Board's decision was arbitrary, capricious, and not supported by substantial evidence. *See* Pl.'s Cross–Mot. at 22. Ms. Verbeck focuses on three main issues in challenging the decision of the Correction Board. First, she contends that the Correction Board failed properly to evaluate her Commissioned Officer Effectiveness Reports and other positive reviews she had received during her work with the Division of Immigration Health Services. Pl.'s

---

**15.** eCCIS CC23.7 is a personnel instruction that was promulgated by the Surgeon General. *See* Def.'s Response to Court's Order Requesting Supplemental Briefing Regarding Authority that Authorizes Regulations, Second Supplemental App. at 4 (Department of Health and Human Services Personnel Instruction Transmittal Sheet (Nov. 5, 1996)). The Secretary of Health and Human Services, through the Assistant Secretary for Health, has delegated authority to the Surgeon General to prescribe personnel instructions. Surgeon General, Delegation of Authority, 53 Fed.Reg. 5,046 (Feb. 19, 1988). The delegation to the Surgeon General also gave him or her the authority "to administer the PHS Commissioned Corps Personnel System." *Id.* at 5,046–47.

Cross–Mot. at 7–9, 25. Second, Ms. Verbeck asserts that Correction Board failed to "consider the evidence submitted . . . challenging the credibility of the documentation and the personnel preparing said documentation which formed the basis of [d]efendant's termination of Verbeck." *Id.* at 23. Lastly, Ms. Verbeck focuses attention on the fact her termination was by the Director of the Division of Commissioned Corps, not INS, and the Correction Board erred in its alternative conclusion that it did not have jurisdiction over her claims. *Id.* at 22–23.

The government largely focuses its arguments on the first of these three contentions, giving greatly reduced attention to the latter two grounds for Ms. Verbeck's challenge. The government contends that there is sufficient evidence in the administrative record to support the Correction Board's conclusion that Ms. Verbeck's termination was proper. *See* Def.'s Mot. at 15. The government asserts that Ms. Verbeck's Commissioned Officer Effectiveness Reports were considered by the Correction Board and that those documents "do not tell the complete story of Ms. Verbeck's performance." Def.'s Reply at 7. In support of its argument, the government cites to evidence in the administrative record that Ms. Verbeck had difficulty interacting with others, including one of her supervisors, and that her behavior had the effect of creating a difficult work environment. Def.'s Mot at 15; Def.'s Reply at 8–10.

The regulation governing Commissioned Officer Effectiveness Reports provides that they are "used as a major source of information concerning each officer's Service performance and work record," and are "extensively used in the evaluation of officers for various personnel actions. *All boards—including . . . involuntary retirement and separation—must rely on the report when evaluating officers.*" Pl. Am. Opp'n, App. at 46 (eCCIS CC25. 1(C)(1), (2)) (emphasis added). Ms. Verbeck's Effectiveness Reports were before the Corrections Board as exhibits to Ms. Verbeck's application to the Board. *See* AR–167 to 176 (Exhibit J, Ms. Verbeck's Commissioned Officer Effectiveness Reports, Application to Board for Correction of PHS Commissioned Corps Records). Nonethe-

less, the Correction Board did not address those Reports either in its deliberations, as reflected by the minutes, or in its final decision. AR–424 to 426 (Draft of Minutes for the Board of Corrections of PHS Commissioned Corps Records (Feb. 9, 2007)); AR–431 to 433 (Correction Board's Decision).

Ms. Verbeck's Effectiveness Report for 2001 assigned her an overall job performance rating of "exceptional." AR–169 (Ms. Verbeck's Commissioned Officer Effectiveness Report for 2001). The Effectiveness Report stated that Ms. Verbeck possessed "[s]ound clinical judgment" and "[g]ood analytical skills, especially in clinical setting." *Id.* at AR–172. Ms. Verbeck's Effectiveness Report from 2000 also classified her job performance as "exceptional." AR–176 (Ms. Verbeck's Commissioned Officer Effectiveness Report for 2000). Both Effectiveness Reports stated that she worked with other individuals in ways that helped to produce a better work result. *See, e.g.,* AR–174 (Ms. Verbeck's Commissioned Officer Effectiveness Report for 2000) (stating that Ms. Verbeck "[w]orks with others in ways which maximize the contributions of each person and consistently produces excellent results"); AR–167 (Ms. Verbeck's Commissioned Officer Effectiveness Report for 2001) (stating Ms. Verbeck "[i]s able to cooperate with others in a manner that helps produce better work than any one member of the group could produce").

In addition to her Commissioned Officer Effectiveness Reports, Ms. Verbeck submitted to the Correction Board several awards and commendations that she had received. AR–178 to 187 (Exhibit K to Ms. Verbeck's Application to Board for Correction of PHS Commissioned Corps Records). The commendations Ms. Verbeck received demonstrate that she was a dedicated employee who possessed strong medical skills. *See* AR–178 (Mem. from Anthony to Verbeck (May 14, 2001)) (referring to comments by a Captain of the Los Angeles Fire Department commending Ms. Verbeck's handling of a medical emergency); AR–179 (Mem. from Lieutenant Bruce Lyday, Security, to Anthony (undated)) (referring to exemplary emergency treatment given by Ms. Verbeck to a

detainee suffering a *grand mal* seizure); AR–180 (Anthony to Verbeck (Aug. 21, 2001) (same)). The awards were made by both PHS and the Navy. PHS presented Ms. Verbeck with the Hazardous Duty Award on June 21, 2001, *see* AR–182, and also a Recognition Award "[f]or outstanding team work" on May 5, 2000. *See* AR–185. Ms. Verbeck's clinical director, Commander Sowinski, stated that "[s]he [was] a superior nurse practitioner with excellent clinical skills. She has good clinical acumen, can practice independently, and shows good judgment in seeking consultation when appropriate." AR–64 (Mem. from Sowinski to Verbeck (May 9, 2002)).

The Correction Board did make an attenuated and tangential reference to Ms. Verbeck's performance evaluations. In addressing Ms. Verbeck's claim that she should have been promoted, the Correction Board noted that she was "recommended to be considered by the Promotion Board" but that she did not place high enough to be selected. AR–432 (Correction Board Decision). In no other respect did the Correction Board address the positive aspects of Ms. Verbeck's performance. *See* AR–425 (Draft of Minutes for Board for Correction of PHS Commissioned Corps Records).

The government concedes that Ms. Verbeck possessed strong clinical skills. Def.'s Reply at 10. However, it asserts that Ms. Verbeck's clinical skills are irrelevant because "[t]he agency's removal action was not based upon Ms. Verbeck's clinical skills." *Id.* The government focuses on the difficulties Ms. Verbeck had interacting with her co-workers, that she was not amenable to supervision by one of her superiors, and created an inhospitable working environment. Def.'s Mot. at 15. The administrative record does support this conclusion, particularly insofar as Ms. Verbeck's work with Commander Anthony was concerned. *See* AR–373 to 375 (Mem. from Anthony to Atwood) (describing instances where Ms. Verbeck had difficulties with other members of the medical staff); AR–339 (Mem. from Migliaccio to Rear Admiral Davidson) (stating that Ms. Verbeck was "critical and condescending to staff"). Additionally, Ms. Verbeck was often unrecep-

tive to criticism and supervision from Commander Anthony. *See id.*

Overall, in addressing Ms. Verbeck's performance, the Correction Board focused solely on negative evaluations of Ms. Verbeck, not discussing or appearing to give attention to positive aspects of her work, including any commendations and awards. The Correction Board thus failed to indicate that it in any way consider all relevant aspects of Ms. Verbeck's service with the Commissioned Corps. This manifest failure to consider relevant evidence is particularly notable insofar as the Commissioned Officer Efficiency Reports are concerned. In that regard, the Correction Board was obliged by PHS' regulations for the Commissioned Corps to "rely on the report[s] when evaluating officers." Pl.'s Am. Opp'n, App. at 46 (eCCIS CC.25.1(C)(2)), quoted more fully *supra*, at 20. It failed to do so.

The second and third grounds presented by Ms. Verbeck in challenging the Correction Board's decision are equally troubling. The Correction Board failed to address Ms. Verbeck's evidence that Commander Sowinski's initials on the memorandum dated February 19, 2002 from Commander Anthony and Commander Sowinski to Commander Jarres were forged. *See, e.g.,* AR–19 to 20 (Ms. Verbeck's Application to Board for Corrections of PHS Commission Corps Records); AR–202 (Opinion of Certified Document Examiner). On this record, the memorandum of February 19, 2002 is critically important as an evidentiary matter because it set forth "the reasons why ... LCDR Verbeck's continued presence in the facility is detrimental to the functioning, productivity, and staff morale in this facility." AR–369 (Mem. from Anthony and Sowinski to Jarres). The problems identified in this memorandum with Ms. Verbeck's performance served as the basis for Dr. Migliaccio's request, on behalf of the Division of Immigration Health Services, that she be terminated during her probation period. *See* AR–338 to 339 (Mem. from Migliaccio to Rear Admiral Davidson). Additionally, Captain Canton relied on the problems identified with Ms. Verbeck's performance in this memorandum as the foundation for the two justifications offered to explain why Ms. Ver-

beck's commission was being terminated. *See* AR–405 (Termination).

■ The government contends that "Commander Sowinski has not stated that he did not initial the February 19, 2002 memorandum, has affirmed that he had input on that memorandum, and the memorandum is consistent with Commander Sowinski['s] other statements regarding Ms[.] Verbeck's behavioral problems." Def.'s Reply at 10 n. 5. In support of its argument that Commander Sowinski was involved in drafting the memorandum of February 19th and initialed the final version, the government relies on an unsigned and undated affidavit that was submitted in connection with the investigation of Ms. Verbeck's Equal Opportunity complaints. AR–500 (Exhibit 12 to the Report of the Office of Equal Opportunity and Civil Rights Regarding Ms. Verbeck's EEO Complaint No. CC–05–02). It is axiomatic that an unsigned affidavit is not entitled to any evidentiary weight. Indeed, there is no evidence in the administrative record that Commander Sowinski had any role in preparing the draft affidavit. Thus, the government has no support for its contention that Commander Sowinski was involved in drafting the memorandum of February 19th and no evidence to counter Ms. Verbeck's expert's conclusion that he did not initial the memorandum.[16]

The government's argument that the critical statements about Ms. Verbeck's job performance in the memorandum dated February 19th were consistent with other statements made by Commander Sowinski is misplaced. In a contemporaneous e-mail to his superior, Dr. Rivera, Commander Sowinski stated that Ms. Verbeck "is a very good nurse practitioner with good clinical skills. . . . She does, however, seem to cycle with periods of dysphoria and agitation. . . . When these periods occur, she can become intrusive and have difficulty with her peers. She also has trouble with supervision and her ability to accept direction." AR–346

(Email from Commander Sowinski to Dr. Ada Rivera (Feb. 12, 2002)); *see also* AR–381 (Mem. from Anthony to Atwood (Feb. 15, 2002)) (referencing that Commander Anthony recalled Commander Sowinski's stating that Ms. Verbeck "was intrusive, disruptive, and caus[ed] division among the staff"). These statements reflect some aspects of the evaluation of Ms. Verbeck's work that appears in the memorandum of February 19th; however, they also report positive aspects of Ms. Verbeck's work, none of which are set out in the memorandum.

Lastly, the Correction Board stated that it "lack[ed] jurisdiction over INS personnel activities." AR–432 (Correction Board's Decision). This conclusion by the Board is manifestly correct, if taken at face value, but clearly erroneous insofar as it indicates or implies that Ms. Verbeck was terminated by INS rather than PHS. The administrative record establishes beyond any doubt that Ms. Verbeck was an officer in PHS' Commissioned Corps. Given its conclusion that Ms. Verbeck was properly terminated by PHS, the Correction Board's statement regarding jurisdiction over INS personnel is wholly misplaced. In other circumstances, the court might well consider such a gratuitous observation to be harmless error. However, given the Correction Board's treatment of other issues surrounding Ms. Verbeck's termination, the statement concerning its jurisdiction confirms that Ms. Verbeck's claims were not fully and thoughtfully considered.

In supporting the Correction Board's mode of explaining its decision on Ms. Verbeck's claim, the government compares PHS' regulations to those of other military services. *See* Def.'s Resp. at 16. The government specifically cites and compares eCCIS CC29.9(B) ("when relief is denied under this Section, the applicant is advised of the reasons for the denial and of any right he [or] she may have to further proceedings")[17] with

---

16. Obviously, the mere fact that Commander Sowinski did not actually initial the memorandum is not by itself an indication that he did not approve and join the memorandum and authorize someone else to initial the memorandum for him. However, there is no evidence whatsoever to support any such hypothesis.

17. In the same vein, a separate PHS regulation not cited by the government provides: "If denial of relief is recommended, the written findings and conclusions will include the reasons for the determination that relief should not be granted, together with all the essential facts upon which the denial is based." Officers' Relations, Ser-

32 C.F.R. § 723.3(e)(4) (2003) (a Navy regulation) ("The brief statement of the grounds for denial shall include the reasons for the determination that relief should not be granted, including the applicant's claims of constitutional, statutory and/or regulatory violations that were rejected, together with all the essential facts upon which the denial is based.").

The government argues that the Correction Board satisfied its obligation by "provid[ing] the reasons for affirming Ms. Verbeck's dismissal," Def.'s Resp. at 16, suggesting that it was not necessary for the Board specifically to address arguments raised by Ms. Verbeck. Notably absent from PHS' regulation in contrast to that applicable to the Navy's boards, is any requirement that the Correction Board address countervailing evidence and arguments. The government's reliance on PHS' provision to vindicate the Corrections Board's failure to address pertinent arguments by Ms. Verbeck is unavailing. The Supreme Court has explained that an agency's decision is arbitrary and capricious when it

> has relied on factors which Congress has not intended it to consider, *entirely failed to consider an important aspect of the problem,* offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfr. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (emphasis added). In this vein, the Federal Circuit has explained that "it is well settled that an agency must explain its action with sufficient clarity to permit 'effective judicial review.'" *Timken U.S. Corp. v. United States,* 421 F.3d 1350, 1355 (Fed.Cir.2005) (quoting *Camp v. Pitts,* 411 U.S. 138, 142–43, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973)); *see also Baltimore & Ohio R.R. Co. v. Aderdeen & Rockfish R.R. Co.,* 393 U.S. 87, 91–92, 89 S.Ct. 280, 21 L.Ed.2d 219 (1968) (rejecting a conclusion of the Interstate Commerce Commission that

lacked support in the record, stating that if the Court upheld the determination, "[t]he requirement for administrative decisions based on substantial evidence and reasoned findings—which alone make effective judicial review possible—would become lost in the haze of so-called expertise"); *Frizelle v. Slater,* 111 F.3d 172, 177 (D.C.Cir.1997) (concluding that a correction board's decision was arbitrary because it "did not respond to two of [claimant's] arguments, which do not appear to be frivolous on their face and could affect the [c]ourt's ultimate disposition"). For judicial review to be effective under the standards prescribed by the Administrative Procedure Act, "the agency tribunal must present a full and reasoned explanation of its decision. The agency tribunal must set forth its findings and the grounds thereof, as supported by the agency record, and explain its application of the law to the found facts." *In re Sang–Su Lee,* 277 F.3d 1338, 1342 (Fed. Cir.2002); *see also State Farm,* 463 U.S. at 43, 103 S.Ct. 2856 (stating that a reviewing court must determine "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment") (quoting *Bowman Transp. Inc. v. Arkansas–Best Freight Sys., Inc.,* 419 U.S. 281, 285, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974)). The government's proposed application of eCCIS CC29.9(B) would prevent effective judicial review of a decision by the Correction Board, as it would allow the Board to circumvent the requirement of providing a sound and reasoned decision that addresses all of the relevant facts and issues before it. *See Allentown Mack Sales and Serv., Inc. v. NLRB,* 522 U.S. 359, 374, 118 S.Ct. 818, 139 L.Ed.2d 797 (1998); *In re Sang–Su Lee,* 277 F.3d at 1342. If the Correction Board almost entirely omits to mention and to analyze countervailing evidence, the Board runs the definite risk that upon judicial review, its decision-making process will be found to be flawed. Judicial review under the Administrative Procedure Act cannot be circumscribed by an agency personnel regulation that allows or contemplates a one-sided explanation for the agency's result.

vices, and Benefits: Miscellaneous, eCCIS CC49.9(I)(4), *available at* http://dcp.psc.gov/eccis/ documents/CCPM49_9_1.pdf.

In sum, the Correction Board's decision to uphold Ms. Verbeck's termination was arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A). The adverse comments relative to Ms. Verbeck's interactions with one of her superiors and with her co-workers were made only after Ms. Verbeck submitted complaints about compliance with occupational and safety standards. The Board failed to address Commander Sowinski's role in the termination, including the evidence that Commander Sowinski's initials on the memorandum dated February 19, 2002, which served as the basis for termination, were forged. The Board wholly ignored any positive aspects of Ms. Verbeck's performance, including particularly her official Evaluation Reports, which it was obliged by regulation to take into account. Finally, the Board's statement implying that Ms. Verbeck's termination was an INS personnel action was erroneous and reinforces the conclusion that the Board failed seriously to consider the issues presented in her application to the Board for relief.

B. *Separation Based on Disability*

 Ms. Verbeck also contends that she was entitled to separation based upon disability and to receive a disability severance payment. *See, e.g.,* Pl.'s Cross–Mot. at 13, 28–29. Ms. Verbeck's claim to receive disability severance was premised upon the fact that she was suffering from breast cancer and depression. *Id.* at 28–29. In ruling on Ms. Verbeck's request in this regard, the Correction Board stated that her "record supports a conclusion by the Medical Affairs Branch (MAB) that Ms. Verbeck's request should be denied because the evidence shows that she was not unfit for continued duty at the time of her discharge.... Ms. Verbeck was psychiatrically fit for duty." AR–432 (Correction Board's Decision). Ms. Verbeck asserts that the Correction Board's decision was arbitrary and capricious because PHS contravened its regulations when she was not referred to a PHS Medical Review Board. Pl.'s Cross–Mot. at 13–18. In this respect, Ms. Verbeck alleges that "the Board failed to consider and take into account [her] recent history of breast cancer, with follow up surgeries," *id.* at 28, and that she "was never evaluated for her physical condition or de-

pression" despite her supervisors' concerns about how her health was affecting her job performance. *Id.* at 29.

During her tenure at the San Pedro facility, Ms. Verbeck suffered from an array of illnesses. Due to her breast cancer surgeries and complications during recovery, Ms. Verbeck missed approximately eighty days of work. *See* AR–377 (Mem. from Anthony to Atwood (Feb. 15, 2002)). She also began to suffer from Major Depression, single episode. AR–249 (Letter from Dr. Frenchen to Dr. Hooper (Feb. 27, 2002)). In conducting a mental evaluation of Ms. Verbeck, Captain Nash found "[m]ajor [d]epressive [d]isorder, [s]ingle [e]pisode, in remission[;][o]bsessive-[c]ompulsive and [p]aranoid [p]ersonality [t]raits[;] S/P [m]astectomy with complications for breast carcinoma[;][and][m]ultiple occupational stresses in addition to ongoing health concerns." AR–190 (Letter from Nash to Atwood (Mar. 7, 2002)). These medical conditions led Commander Anthony to opine that "[Ms.] Verbeck poses a serious risk to the safety of herself, fellow employees, and patients." AR–371 (Mem. from Anthony to Atwood (Feb. 15, 2002)). Given the severity of Ms. Verbeck's medical conditions, Commander Anthony placed her on "[n]onduty [w]ith [p]ay [s]tatus ... pending receipt of a second opinion evaluation by the Medical Affairs Branch." AR–396 (Mem. from Anthony to Verbeck (Feb. 20, 2002)).

Prior to the effective date of her termination, Ms. Verbeck, through her attorney, sent a request to Rear Admiral Davidson requesting that her termination be delayed because she was "unfit to be discharged." AR–261 (Letter from David Sheldon, Ms. Verbeck's Attorney, to Rear Admiral Davidson (May 30, 2002)). The letter explained that Ms. Verbeck was "continuing to receive ongoing care resulting from her mastectomy and reconstructive surgery, as well as treatment for depression, which, while in remission, is certainly being aggravated by these developments." *Id.* Stating that he was aware of Ms. Verbeck's medical issues, Rear Admiral Davidson denied Ms. Verbeck's request that her termination be postponed until her medical issues were addressed. AR–266 (Letter from Rear Admiral Davidson to Sheldon (June 17, 2002)).

Ms. Verbeck's ability to interact constructively with her coworkers varied during her tenure with the PHS' Commissioned Corps. *Compare* AR–346 (E-mail from Sowinski to Rivera) (Feb. 12, 2002) (relating that Ms. Verbeck "seem[s] to cycle with periods of dysphoria and agitation"); *and* AR–338 to 339 (Mem. from Migliaccio to Rear Admiral Davidson (Apr. 4, 2002)); *with* AR–167 to 176 (Ms. Verbeck's Commissioned Officer Effectiveness Reports for 2000 and 2001). Only Captain Nash's medical evaluation of Ms. Verbeck contained a discussion of the effect Ms. Verbeck's illnesses had on her ability to interact with other individuals. *See* AR–189 to 191 (Letter from Nash to Atwood (Mar. 7, 2002)). In his evaluation of Ms. Verbeck, Captain Nash stated that "[g]iven her stresses and the obvious [e]ffects they have on her emotional state and interpersonal functioning . . . consideration should be given to transferring her to a less stressful work environment." *Id.* at AR–190 to 191. From the record, it is difficult to determine what effect Ms. Verbeck's illnesses had on her ability consistently to interact constructively with her coworkers and superiors, thereby affecting her job performance. The opinion by Ms. Verbeck's physician that she was fit for duty in February 2002, *see* AR–249 (Letter from Dr. Frenchen to Dr. Hooper (Feb. 27, 2002)), presumably related to her then-existing position at the San Pedro facility. The Correction Board apparently relied on that finding when it concluded that "[a]t the time that she separated, she was found fit for full duty and thus was not entitled to a disability retirement." AR–431 (Correction Board's Decision). The Board also relied on the paper review performed in 2005 by Dr. Caserta as evidence that Ms. Verbeck was fit for duty at the time of her termination. *See id.* AR–432 (relying on Dr. Caserta's review as a ground for rejecting Ms. Verbeck's claim to the Board that her VA disability rating should apply to support a severance payment for disability at separation) (referring to AR–403 (Mem. from Caserta to Captain Canton (Sept. 22, 2005))). However, this evidence does not address Captain Nash's evaluation

in March 2002, which evaluation followed Dr. Rivera's expressed concern about Ms. Verbeck's state of mind. In short, there was evidence before the Board of a medical condition which arose during the course of service. Because the Correction Board acknowledged no impairment and the available evidence uniformly shows the existence of some impairment, the Correction Board's evaluation of Ms. Verbeck's medical condition was flawed. *See Farrar v. United States,* 173 Ct.Cl. 1008, 358 F.2d 965 (1965) (granting relief to a disability claimant whose request had been denied by the Board for Correction of Military Records, where the Board was arbitrary in not granting entitlement based upon evidence the claimant presented to the Board). Correction boards are "competent to make a disability determination in the first instance," *Sawyer,* 930 F.2d at 1581, and on remand, the Correction Board should do so, or cause such a determination to be made.

### CONCLUSION

For the reasons stated, plaintiff's motion for judgment on the administrative record is GRANTED IN PART and DENIED IN PART. Defendant's motion to dismiss and for judgment on the administrative record is DENIED.[18] The denial of relief to Ms. Verbeck by the Board for Correction of PHS Commissioned Corps Records is VACATED, and the case shall be remanded to the Board for six months. *See* RCFC 52.2(a). During that time proceedings in this court shall be stayed. *See* RCFC 52.2(b)(1). The Board shall consider whether the termination of Ms. Verbeck's commission was appropriate and whether she should have been separated with a severance payment based on disability. *See id.* Defendant shall file a report on the status of the proceedings on remand within 90 days after the issuance of this opinion and order, and within each succeeding 90–day period thereafter. *See id.*

It is so ORDERED.

---

18. The government's motion to supplement the administrative record is GRANTED. Ms. Verbeck's motion to supplement the administrative record is GRANTED IN PART and DENIED IN PART, for the reasons stated *supra,* at 12 n. 10.